Majel M. Russell (Montana Bar No. 4057)
Elk River Law Office, P.L.L.C.
145 Grand Avenue, Suite 5
PO Box 928
Billings, MT 59101
Phone: (406) 259-8611
Fax: (406) 259-3251
mrussell@elkriverlaw.com

Mark A. Echo Hawk (*pro hac vice* 1:16-CV-11)
ECHO HAWK & OLSEN, PLLC
505 Pershing Ave., Suite 100
PO Box 6119
Pocatello, Idaho 83205
Phone: (208) 478-1624
Fax: (208) 478-1670
mark@echohawk.com

*Attorneys for Shoshone Tribe*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SHOSHONE TRIBE OF THE WIND RIVER RESERVATION, <br><br> Plaintiff, <br><br> v. <br><br> RYAN ZINKE, Secretary of the Interior; UNITED STATES DEPARTMENT OF INTERIOR; UNITED STATES BUREAU OF INDIAN AFFAIRS; MICHAEL BLACK, Acting Assistant Secretary for Indian Affairs; DARRYL LACOUNTE, Rocky Mountain Regional Office Director for Bureau of Indian Affairs, Billings, Montana; LOUISE REYES, Rocky Mountain Regional Office Indian Services Officer for Bureau of Indian Affairs; NORMA GOURNEAU, Bureau of Indian Affairs | Civil No. CV-17-45-BLG-BMM |

Majel M. Russell (Montana Bar No. 4057)
Elk River Law Office, P.L.L.C.
145 Grand Avenue, Suite 5
PO Box 928
Billings, MT 59101
Phone: (406) 259-8611
Fax: (406) 259-3251
mrussell@elkriverlaw.com

Mark A. Echo Hawk (*pro hac vice* 1:16-CV-11)
ECHO HAWK & OLSEN, PLLC
505 Pershing Ave., Suite 100
PO Box 6119
Pocatello, Idaho 83205
Phone: (208) 478-1624
Fax: (208) 478-1670
mark@echohawk.com

*Attorneys for Shoshone Tribe*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SHOSHONE TRIBE OF THE WIND RIVER RESERVATION,<br><br>Plaintiff,<br><br>v.<br><br>RYAN ZINKE, Secretary of the Interior; UNITED STATES DEPARTMENT OF INTERIOR; UNITED STATES BUREAU OF INDIAN AFFAIRS; MICHAEL BLACK, Acting Assistant Secretary for Indian Affairs; DARRYL LACOUNTE, Rocky Mountain Regional Office Director for Bureau of Indian Affairs, Billings, Montana; LOUISE REYES, Rocky Mountain Regional Office Indian Services Officer for Bureau of Indian Affairs; NORMA GOURNEAU, Bureau of Indian Affairs | Civil No. CV-17-45-BLG-BMM |

Superintendent Wind River Agency;
RAY NATION, Bureau of Indian
Affairs Deputy Superintendent Wind
River Agency

Defendants.

## COMPLAINT

Plaintiff, the Shoshone Tribe of the Wind River Reservation, or Eastern Shoshone Tribe (EST), by and through its undersigned counsel, alleges as follows:

### I. NATURE OF THE CASE

1.      This is an action to stop the federal Defendants from facilitating the Northern Arapaho Tribe's (NAT) attempt to assert unlawful control over governance on the Wind River Reservation (Reservation) and federal funding available to tribal members.

2.      NAT alleges that it should be the dominant governance authority on the Reservation because it has more tribal members than EST.  Case No. 1:16-CV-00011-BMM, Doc. 1, Complaint, Paragraphs 13 and 42.

3.      Simply put, NAT wants more money and more power, even though federal courts have recognized for a long time that the two tribes rightly participate in joint governance of shared programs, and share an undivided interest in Reservation resources.

4.      NAT's effort to become the governing authority on the Reservation and unilateral controller of shared, federally-funded programs, and the federal Defendants' related acts and omissions to facilitate that unlawful scheme, undermine the sovereign rights of EST recognized by the supreme law of the land on the Wind

River Reservation—the Treaty between the United States and the Eastern Band Shoshoni and Bannock, 15 Stat. 673 (Treaty).

5.      This is also an action to compel the Defendants to award and fund certain P.L. 93-638 Indian Self-Determination and Education Assistance Act (ISDEAA) contract applications filed by EST on behalf of the Joint Business Council (JBC).

6.      This action seeks to compel the Defendants to cease and desist in their continued recognition of, and support for, NAT's illegitimate 'Shoshone and Arapaho Tribal Court'.

7.      This action also seeks to compel the Defendants to recognize and facilitate the function of the JBC.

8.      This action seeks to compel the Defendants to uphold their Treaty obligations under Article 1 to the EST to keep the peace on the Reservation and prevent and prohibit the NAT from continuing to unilaterally implement the unlawful 'Shoshone and Arapaho Tribal Court' that continues to render meaningless orders and judgements that interfere with EST's attempts to keep peace on the Wind River Reservation.

9.      This action seeks to compel the Defendants to take immediate action in removing the NAT's illegitimate 'Shoshone and Arapaho Tribal Court' from the BIA's building, as the use of this building for the illegitimate NAT court assists that court in an ongoing depredation of EST sovereignty.

10.     This action seeks to compel the Defendants to uphold their Treaty obligations under Article 2 to the EST to prevent infringement on the EST's sovereign territorial right to absolute and undisturbed use and occupation of the

Wind River Reservation by allowing NAT to interfere with EST's governing authority over the EST membership and the Wind River Reservation.

11.     This action seeks to compel the Defendants to uphold their Treaty obligations under Article 5 to the EST and conduct a prompt and diligent inquiry into all depredations caused by the Northern Arapaho's Business Council's unilateral withdrawal from the JBC.

12.     This action seeks to comple the Defendants to take all actions necessary to protect the EST from all depredations caused by Northern Arapaho's Business Council's unilateral withdrawl from the JBC and that such actions taken to protect EST from NAT's depredations are Treaty obligations that do not require NAT's consent as NAT's actions are a current overreach of their sovereignty to the derogation of the EST.

13.     This action seeks to compel the Defendants to uphold their Treaty obligations under Article 6 to adopt laws for the governance of the EST and adopt the Shoshone and Arapaho Law and Order Code for implementation by the BIA Code of Federal Regulations Court while that Court remains operational on the Wind River Reservation.

14.     In addition, this action seeks to enjoin the Defendants from encroaching upon and diminishing EST's inherent sovereign authority to jointly govern and participate in the tribal justice system on the Reservation.

15.     Finally, this action seeks to prevent the Defendants from granting ISDEAA applications filed by NAT that would violate ISDEAA and infringe on the sovereign rights of EST.

## II.  PRELIMINARY STATEMENT

16.     This case is related to two consolidated cases already pending before the Court: *Northern Arapaho Tribe v. Darryl LaCounte, et. al*, 1:16-CV-00011-BMM; and, *Northern Arapaho Tribe v. US Department of Interior, et. al*, 1:16-CV-16-60 GF-BMM.

17.     EST seeks to have the Court relate this case with those two pending cases, assigning the same Judge and relating the cases for general administrative purposes. The Defendants have agreed to stipulate that these are related cases.

18.     In addition, by motion filed contemporaneously herewith, EST seeks to intervene in the two pending cases (16-CV-00011-BMM and 16-CV-16-60 GF-BMM).

## III. JURISDICTION AND VENUE

19.     This Court has jurisdiction over the claims asserted in this matter pursuant to 25 U.S.C. § 5331(a), and § 450M-1 (ISDEAA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C.§§ 1343, 1362, 1367 and 2201, and 5 U.S.C. § 702 (Administrative Procedures Act).

20.     This Court has original jurisdiction under 25 U.S.C. § 5331(a) over any civil action or claim against the appropriate Secretary arising under ISDEAA. In an action brought pursuant to 25 U.S.C. §5331(a), this Court may order appropriate relief including injunctive relief against any action by an officer of the United States or any agency thereof contrary to ISDEAA or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under ISDEAA or regulations promulgated thereunder.

21.     This Court has jurisdiction under 28 U.S.C. § 1331 because the case involves questions arising under the Constitution, laws, and regulations of the United

States, specifically: (a) the ISDEAA, P.L. 93-638, as amended, 25 U.S.C. §§5301 et. seq., in particular § 5331(a); (b) the Administrative Procedures Act, 5 U.S.C. §§ 701-706; and (c) 25 U.S.C. § 2.

22.    Venue is properly in this District under 28 U.S.C. § 1391(e), because at least one of the defendants is an officer or employee of the United States or its agencies and resides in this District.

## IV. PARTIES

23.    EST is a federally-recognized sovereign Indian Tribe, 82 Fed. Reg. 4915 (January 17, 2017), and a party to the Treaty between the United States and the Eastern Band Shoshoni and Bannock, 15 Stat. 673, which established the Wind River Reservation for the absolute and undisturbed use and occupation of the EST.

24.    Defendant Ryan Zinke is the Secretary of the Interior and is sued in his official capacity.

25.    Defendant U.S. Department of the Interior is a federal agency responsible for honoring the United States' trust responsibilities and other obligations to Indian Tribes.

26.    Defendant Bureau of Indian Affairs (BIA) is an agency within the Department of the Interior, responsible for fulfilling the United States' trust responsibility to Indian Tribes and supporting tribal self-determination and self-governance.

27.    Michael Black is the Acting Assistant Secretary of Indian Affairs and the highest official of the BIA. He is sued in his official capacity.

28.     Darryl LaCounte is the Director of the BIA's Rocky Mountain Regional Office, located in Billings, Montana and responsible for BIA's administration in the Rocky Mountain Region. He is sued in his official capacity.

29.     Defendant Louise Reyes is the Indian Services Officer for the BIA's Rocky Mountain Regional Office. She is sued in her official capacity.

30.     Defendant Norma Gourneau is the Superintendent of the BIA's Wind River Agency. She is sued in her official capacity.

31.     Defendant Ray Nation is the Deputy Superintendent of the BIA's Wind River Agency. He is sued in his official capacity.

## V. FACTS

32.     On July 3, 1868, the United States and EST entered into the Treaty, which established the Reservation.

33.     EST's Treaty expressly applies to the Wind River Reservation. None of the treaties upon which NAT relies expressly apply to the Wind River Reservation. EST is the only Indian tribe with a Treaty pertaining to the Wind River Reservation.

34.     The Treaty conferred upon EST "treaty title" or "acknowledged title" to the Reservation, as authorized and ratified by Congress states, in part, the following:

Article 1

From this day forward peace between the parties to this Treaty shall forever continue.  The Government of the United States desires peace, and its honor is hereby pledged to keep it.  The Indians desire peace, and they hereby plege their honor to  maintain it.  If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong

7

upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs, at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.  If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to the laws; and in case they willfully refuse to do so, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or the other treaties made with the United States.  And the President, on advising with the Commisioner of Indian Affiars, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper.  But no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss while violating or because of his violating the provisions of this treaty or the laws of the United States, shall be reimbursed therefore.

Article 2

It is agreed that whenever the Bannacks desire a reservation to be set apart for their use, or whenever the President of the United States shall deem it advisable for them to be put on a reservation, he shall cause a suitable one to

be selected for them in their present country, which shall embrace reasonable portions of the "PortNeuf" and "Kansas Prairie" contries, and that, when this reservation is declared, the United States will secure to the Bannacks the same rights and priveleges therein, and make the same and like expenditures therein for their benefit, except the agency-house and esidence of agent, in proportion to their numbers, as herein provided for the Shoshonee reservation. The United States further agrees that the following district of country, to wit: Commencing at the mouth of Owl Creek and running due south to the crest of the divide between the Sweet-water and Papo Agie Rivers; thence along the crest of said divide and the summit of Wind River Mountains to the longitude of North Fork of Wind River; thence along due north to mouth of said North Fork and up its chanel to a point twenty miles above its mouth; thence in a straight line to head waters of Owl Creek and along middle of channel of Owl Creek to place of beginning, shall be and the same is set apart for the absolute and undisturbed use and occupation of the Shoshonee Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents and employees of the Government as may be authorized to enter upon Indian reservations in discharge of of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this Article for the use of said Indians, and henceforth they will and do hereby relinquish all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the limits aforesaid.

Article 5

The United States agrees that the agens for said Indians shall in the future make his home at the agency building on the Shoshonee reservation, but shall direct and supervise affairs on the Bannack reservation; and shall keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his finding, to the Commissioner of Indian Affairs, whose decision shall be binding on the parties to this treaty.

Article 6

If any individual belonging to said tribes of Indians, or legally incorporated with them, being the head of a family, shall desire to commence farming, he shall have the privilege to select, in the presence and with the assistance of the agent then in charge, a tract of land within the reservation of his tribe, not exceeding three hundred and twenty acres in extent, which tract so selected, certified, and recored in the "land-book", as herein directed, shall cease to be held in common, but the same may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long as he or they may continue to cultivate it. Any person over eighteen years of age, not being the head of a family, may in like manner select and cause to be certified to him or her, for purposes of cultivation, a quantity of land not exceeding eighty

acres in extent, and thereupon be entitled to the exclusive possession of the same as above described. For each tract of land so selected a certificate, containing a description thereof, and the name of the person selecting it, with a certificate indorsed thereon that the same has been recorded, shall be delivered to the party entitled to it by the agent, after the same shall have been recorded by him in a book to be kept in his office subject to inspection, which said book shall be known as the "Shoshone (eastern band) and Bannack land-book." The President may at any time order a survey of these reservations, and when so surveyed Congress shall provide for protecting the rights of the Indian settlers in these improvements, and may fix the character of the title held by each. The United States may pass such laws on the subject of alienation and descent of property as between Indians, and on all subjects connected with the government of the Indians on said reservations, and the internal police thereof, as may be thought proper.

35.     Despite EST's protest, the United States unilaterally and permanently placed NAT on the Reservation.

36.     Due to the United States' broken Treaty obligations, EST has been forced to share the Reservation with NAT and act cooperatively on issues that affect jointly held lands and shared tribal government programs.

37.     The Congress of the United States has not taken affirmative legislative action to diminish the Treaty title or Treaty rights of EST pertaining to the entire Reservation.

38.     The Defendants actions, under ISDEAA and otherwise, must be consistent with the United States' Treaty obligations to EST.

39.    To assist EST and NAT to jointly govern matters of common interest, BIA helped EST and NAT create the JBC.

40.    Around 1987, the JBC passed Resolutions No. 6069 and 6089, requesting that the BIA award P.L. 93-638 self-determination contracts for a Shoshone and Arapaho Tribal Court and requested that all of the existing supplies, materials, facilities, and equipment then being used in connection with providing judicial services on the Reservation also be transferred to the JBC.

41.    Between approximately 1987 and September 30, 2016, the BIA awarded P.L. 93-638 self-determination contracts and provided federal funding for the Shoshone and Arapaho Tribal Court.

42.    In connection with the self-determination contract for judicial services on the Reservation, BIA provided the right to use a government owned court building on the Reservation, located in Fort Washakie, identified by BIA as Building 109 (Court Building).

43.    Beginning in September 2014, the Northern Arapaho Business Council (NABC) refused to meet with the Shoshone Business Council (SBC) to discuss the shared management of joint programs on the Reservation, such as the Shoshone and Arapaho Tribal Court.

44.    NABC and NAT withdrew from participating in the JBC.

45.    The action of NABC and NAT to withdraw from participation did not alone dissolve the JBC.

46.    The most recent self-determination contract for judicial services on the Reservation, Contract No. A16AV00087, was awarded to the JBC through the SBC.

47.    On or about August 3, 2016, Superintendent Gourneau informed both the SBC and NABC that Contract No. A16AV00087 was set to expire and that the

BIA would begin providing judicial services on the Reservation on October 1, 2016, unless the EST and NAT cooperatively agreed on the management of the tribal court self-determination contract and submitted a joint contract proposal.

48.     NABC continued to refuse to meet with SBC or sign a joint resolution to contract for judicial services.

49.     On September 28, 2016, SBC, on behalf of JBC, submitted contract proposals to renew the P.L. 93-638 contracts for Meadowlark, Judicial Services (Tribal Court), Game Code (Fish and Game), Johnson O'Malley, and Tribal Water Engineers.

50.     In its proposals for contract renewal, JBC did not propose any material or substantial change to the scope or funding of any programs, functions, services, or activities.

51.     Also on September 28, 2016, EST submitted separate P.L. 93-638 contract proposals for Meadowlark, Tribal Court, Fish and Game, Johnson O'Malley, and Tribal Water Engineers.

52.     On September 29, 2016, Superintendent Gourneau, on behalf of the BIA, sent a letter to EST confirming receipt of the contract proposals.

53.     On September 29, 2016, NAT filed a civil lawsuit in the Shoshone and Arapaho Tribal Court, identified as Civil Action No. CV-16-0052.

54.     In its tribal court civil lawsuit, NAT requested certain temporary orders and judgment against SBC.

55.     Without any prior notice or opportunity to be heard from EST, Judge John St. Clair, on behalf of the Shoshone and Arapaho Tribal Court, entered a Temporary Order, ordering, among other things, that the Shoshone and Arapaho

Tribal Court would not be suspending or ceasing operation after October 1, 2016, but would remain open for business.

56. On or about September 30, 2016, self-determination Contract No. A16AV00087, pertaining to the funding of the Shoshone and Arapaho Tribal Court, expired.

57. After September 30, 2016, BIA ceased providing contract funding for the Shoshone and Arapaho Tribal Court.

58. On October 3, 2016, Judge John St. Clair rescinded his September 29, 2016 Temporary Order.

59. EST provided Shoshone & Arapaho Tribal Court employees, including John St. Clair, notice that they were laid off as of October 3, 2016 at 3:00 pm.

60. EST then de-authorized the Shoshone and Arapaho Tribal Court through SBC Resolution 2016-10877.

61. SBC notified BIA that the Shoshone and Arapaho Tribal Court no longer had authorization to provide judicial services on the Reservation.

62. After receiving his layoff notice, John St. Clair attempted to issue a new Order of Court, declaring that the Shoshone and Arapaho Tribal Court would continue to remain operational.

63. John St. Clair did not have jurisdiction to unilaterally continue the existence of the Shoshone and Arapaho Tribal Court.

64. John St. Clair's purported order was invalid.

65. NABC has since begun to employ the former members of the Shoshone and Arapaho Tribal Court.

66. NAT has enacted laws, including Title 17, Chapter 5 of the Northern Arapaho Code, creating the Northern Arapaho Tribal Court (NAT Court).

67.    The NAT Court is a separate and distinct tribal justice system from the former Shoshone and Arapaho Tribal Court. *See* Northern Arapaho Code, Title 17, Section 307, Comment ( "…[NAT] rescinded its authority for the Shoshone and Arapaho Tribal Courts to exercise any jurisdiction on behalf of the [NAT]…").

68.    SBC demanded, through Resolution No. 2016-10885 that the BIA provide judicial services on the Reservation through a Court of Indian Offenses, until EST and NAT were able to agree upon joint governance of a Tribal court system.

69.    SBC demanded that BIA take possession of the Court Building and exclude the former employees of the Shoshone and Arapaho Tribal Court.

70.    SBC demanded that the BIA immediately take possession of the former Shoshone and Arapaho Tribal Court property, including files and equipment.

71.    BIA had represented it would do so, and EST relied upon the representation of BIA to its detriment.

72.    The BIA issued an Interim final rule adding a Court of Indian Offenses on the Reservation.

73.    BIA oversees operations of Courts of Indian Offenses, including the Court of Indian Offenses on the Reservation (Reservation CFR Court).

74.    After establishing a Reservation CFR Court, BIA did not oust the illegitimate Shoshone and Arapaho Tribal Court from the Court Building.

75.    BIA represented it would do so, but failed to perform its promise.  EST relied on BIA's promise to its detriment.

76.    BIA did not reclaim files, equipment, or other property previously used by the Shoshone and Arapaho Tribal Court.

77.    BIA personnel met with the illegitimate Shoshone and Arapaho Tribal Court and representatives of the NAT, including NABC and its attorneys to discuss

jurisdiction limits and other sovereignty related issues involving the Reservation CFR Court.

78.    BIA did not include nor seek EST's input on issues involving the jurisdictional limits and other sovereignty issues involving the Reservation CFR Court before meeting with NAT and the illegitimate Shoshone and Arapaho Tribal Court, and did not provide equal opportunity to EST to consult about the transition of cases or function of the NAT Court.

79.    BIA entered into an agreement with the NAT and illegitimate Shoshone and Arapaho Tribal Court relating to division of court cases between the Reservation CFR Court and the illegitimate Shoshone and Arapaho Tribal Court.

80.    EST has not authorized the illegitimate Shoshone and Arapaho Tribal Court to have jurisdiction over any court cases.

81.    EST has not authorized the transfer of cases from the former Shoshone and Arapaho Tribal Court to the NAT Court.

82.    The Reservation CFR Court has not authorized the transfer of former Shoshone and Arapaho Tribal Court cases to the NAT Court.

83.    On December 23, 2016, Superintendent Gourneau issued a letter, on behalf of the BIA, declining the JBC's contract renewal proposal for Judicial Services.

84.    On December 23, 2016, the BIA declined the Meadowlark Youth Services, Tribal Water Engineers, Fish & Game Services, and Johnson O'Malley proposals of JBC.

85.    NAT submitted proposals for the same programs as did SBC, including the Youth / Drug Services 'Meadowlark' Proposal, Fish and Game services, Tribal Water Engineers, and judicial services.

86.    NAT's proposals, if granted, would decrease the amount of funding available on the Wind River Reservation for services to EST members, and would result in a duplication of overhead, and unnecessary duplication of services.

87.    NAT has submitted ISDEAA contract proposals seeking funding based on the premise that the NAT tribal member population is higher than the EST tribal member population so NAT should necessarily have more votes, or control, over federal funding.

88.    NAT has submitted contract proposals based on the premise that federal funding and control over government services must be apportioned according to relative tribal member population.

89.    NAT's attempt to assert control over Reservation governance and federal funds available to tribal members based on relative tribal member populations undermines the sovereign rights of EST recognized by the supreme law of the land on the Wind River Reservation—the Treaty of the Eastern Shoshone Tribe.

## VI. CAUSES OF ACTION

### A.    First Cause of Action: Declaratory Judgment

90.    EST incorporates by reference all preceding paragraphs.

91.    EST is entitled to a declaratory judgment as set forth herein.

### B.    Second Cause of Action: Permanent Injunction

92.    EST incorporates by reference all preceding paragraphs.

93.    EST is entitled to a permanent injunction barring Defendants from further unlawful conduct as set forth herein.

**C.**   **Third Cause of Action: Violation of Treaty, Trust Responsibility and Federally Protected Rights**

94.   EST incorporates by reference all preceding paragraphs.

95.   Defendants have breached their duty of trust to EST.

96.   Defendants have breached their Treaty obligations with EST.

97.   Defendants are being sued by NAT to compel Defendants to exercise their trust responsibility and alleged statutory duties on behalf of NAT in a manner that violates EST's related statutory and Treaty rights.

98.   Defendants' actions alleged in the foregoing Paragraphs violate the federally protected sovereign rights and property rights of EST.

**D.**   **Fourth Cause of Action: Violation of Treaty Obligations to Preserve for the Shoshone Sufficient Resources by Allowing NAT's Overreach**

99.   EST incorporates by reference all preceding paragraphs.

100.   Defendants have breached their treaty obligations to EST.

101.   Defendants are being sued by NAT to compel Defendants to exercise their trust responsibility and alleged statutory duties on behalf of NAT in a manner that derogates their Treaty obligations to EST's related statutory and Treaty rights

**E.**   **Fourth Cause of Action: Injunction or Mandamus to Compel an Award and Fund an Approved Self-determination Contract**

102.   EST incorporates by reference all preceding paragraphs.

103.   EST did not consent to an extension of BIA's 90-day deadline to award or decline the EST contract proposals.

104.   BIA did not seek the written consent of EST to an extension of the 90-day deadline.

105.    Those contract proposals by EST, which were submitted on September 28, 2016, are properly deemed approved.

106.    The Secretary has failed to award EST the P.L. 93-638 contract proposals and otherwise failed to add the full amount of funds pursuant to section 106(a) of ISDEAA.

**E.    Fifth Cause of Action: Administrative Procedures Act, 5 U.S.C. §§701-706**

107.    EST incorporates by reference all preceding paragraphs.

108.    An agency must act within the scope of its authority.

109.    Superintendent Gourneau acted, on behalf of the BIA, arbitrarily and capriciously in declining the JBC's contract renewal proposals for Judicial Services, Meadowlark Youth Services, Tribal Water Engineers, Fish & Game Services, and Johnson O'Malley.

110.    Assistant Secretary Black, has through his acts and omissions, concurred with the arbitrary and capricious actions of the BIA by failing or refusing to rescind the December 23, 2016 Gourneau letter and fully fund the JBC's P.L. 93-638 contracts for Judicial Services, Meadowlark Youth Services, Tribal Water Engineers, Fish & Game Services, and Johnson O'Malley.

111.    Secretary Zinke, has through his acts and omissions, concurred with the arbitrary and capricious actions of the BIA by failing or refusing to rescind the December 23, 2016 Gourneau letter and fully fund the JBC's P.L. 93-638 contracts for Judicial Services, Meadowlark Youth Services, Tribal Water Engineers, Fish & Game Services, and Johnson O'Malley.

112.   The Court must compel the Defendants to rescind the December 23, 2016 Gourneau declination letters.

113.   The BIA's review of JBC's contract renewal proposals under the declination criteria of 25 CFR § 900.22 and subsequent declinations violated agency regulations governing the denial of P.L. 93-638 funding.

114.   Defendants' declination of JBC's contract renewal proposals was without observance of procedure required by law, was unlawful and must be set aside.

115.   The Court must compel Defendants to award and fully fund JBC's P.L. 93-638 contract renewal proposals for Judicial Services, Meadowlark Youth Services, Tribal Water Engineers, Fish & Game Services, and Johnson O'Malley and add the full amount of funds pursuant to section 106(a) of ISDEAA.

## F.   Sixth Cause of Action: Administrative Procedures Act, 5 U.S.C. §§701-706

116.   EST incorporates by reference all preceding paragraphs.

117.   An agency must act within the scope of its authority.

118.   Superintendent Gourneau acted, on behalf of the BIA, arbitrarily and capriciously in declining the SBC's proposal or contract renewal proposal for judicial services.

119.   Assistant Secretary Black, has through his acts and omissions, concurred with the arbitrary and capricious actions of the BIA by failing or refusing to rescind the December 23, 2016 Gourneau letter, award and fully fund the SBC's P.L. 93-638 proposal to contract for judicial services.

120.   Secretary Zinke, has through his acts and omissions, concurred with the arbitrary and capricious actions of the BIA by failing or refusing to rescind the

December 23, 2016 Gourneau letter, award and fully fund the SBC's P.L. 93-638 proposal to contract for judicial services.

121.   The BIA's review of SBC's contract proposal under the declination criteria of 25 CFR § 900.22 and subsequent declination violated agency regulations governing the denial of P.L. 93-638 funding.

122.   Defendants' declination of SBC's proposal was without observance of procedure required by law, was unlawful and must be set aside.

123.   The Court must compel Defendants to award and fully fund SBC's P.L. 93-638 proposal for judicial services and add the full amount of funds pursuant to section 106(a) of ISDEAA.

## G.   Seventh Cause of Action: Breach of Statutory and Common Law Trust Responsibility

124.   EST incorporates by reference all preceding paragraphs.

125.   Congress, through statutes, treaties, and the exercise of administrative authorities, has recognized the self-determination, self-reliance, and inherent sovereignty of Indian tribes, such as EST.

126.   The United States has a trust responsibility to each tribal government that includes the protection of the sovereignty of each tribe.

127.   Tribal justice systems, including Courts of Indian Offenses established under 25 CFR § 11.100, are an essential part of the sovereignty of tribal governments and serve as important forums for ensuring public health and safety and the political integrity of tribal governments.

128.   The Defendants' support of the illegitimate 'Shoshone and Arapaho Tribal Court' run by NAT encroaches upon and diminishes the inherent sovereign authority of EST.

129.   The Defendants' treatment of the illegitimate NAT 'Shoshone and Arapaho Tribal Court' as an authorized tribal justice system encroaches upon and diminishes the inherent sovereign authority of EST.

130.   The Defendants' recognition of the illegitimate NAT 'Shoshone and Arapaho Tribal Court' encroaches upon and diminishes the inherent sovereign authority of EST.

131.   The Defendants' failure to remove the illegitimate NAT 'Shoshone and Arapaho Tribal Court' from the Court Building and reclaim property formerly used by the Shoshone and Arapaho Tribal Court encroaches upon and diminishes the inherent sovereign authority of EST and EST's capacity to participate in Reservation law and order governance.

132.   The Defendants' allowance of the illegitimate Shoshone and Arapaho Court to retain former Shoshone and Arapaho Court case files encroaches upon and diminishes the inherent sovereign authority of EST.

133.   Entering into agreements concerning the jurisdictional limits and/or division of cases between the Reservation Court, illegitimate 'Shoshone and Arapaho Court', and/or NAT Court without EST's authorization, consultation, or involvement encroaches upon and diminishes the inherent sovereign authority of EST.

134.   If not enjoined by order of this Court, BIA will continue to recognize, acknowledge, or otherwise sanction actions of the illegitimate NAT 'Shoshone and Arapaho Tribal Court', resulting in the continued encroachment and diminishment of its inherent sovereign authority.

135.   The actions of the Defendants impair the rights of EST to self-determine the nature and governance of the legal system on the Reservation.

136.   EST lacks any adequate remedy at law to address these wrongs and an injunction is required.

## VII. DAMAGES

137.   EST has suffered damages, including loss of pre-award costs, loss of federal funding, and attorney fees due to Defendants' actions.

## VIII.  PRAYER FOR RELIEF

Wherefore, Plaintiff, the EST, respectfully requests that this Court enter judgment in its favor and against the Defendants as follows:

A.     An order compelling the Defendants to take all necessary steps to rescind the December 23, 2016 letters issued by Superintendent Gourneau, and to notify the Department of Interior and Bureau of Indian affairs and all persons with whom Superintendent Gourneau's determination was shared that the determination was erroneous and is without force or effect;

B.     An order or writ of mandamus compelling Defendants to award and fund self-determination contracts to EST and/or JBC for Meadowlark, Tribal Court, Fish and Game, Johnson O'Malley, and Tribal Water Engineers;

C.     An order compelling the Defendants to refrain from recognizing, acknowledging, or otherwise sanctioning any orders, warrants, judgments, or other actions of the illegitimate NAT 'Shoshone and Arapaho Tribal Court' issued on or after October 3, 2016;

D.     An order enjoining the Defendants from sanctioning any current actions of the NAT 'Shoshone and Arapaho Tribal Court' until both EST and NAT authorize such tribal justice system;

E.      An order compelling the Defendants to take exclusive control of federal property previously used to administer the former Shoshone and Arapaho Tribal Court, including the Court Building, files, and equipment;

F.      An order compelling the Defendants to exclude the illegitimate NAT run 'Shoshone and Arapaho Tribal Court' from conducting any activities in the Court Building;

G.      An order compelling the Defendants to direct the Reservation CFR Court to assume all cases pending in the illegitimate NAT 'Shoshone and Arapaho Tribal Court' on or after October 3, 2016;

H.      An order compelling the Defendants to consult equally with both EST and NAT on a transition plan for moving cases from the Reservation CFR Court to the NAT Court.

I.      A declaratory judgment that JBC is a viable, functioning 'tribal organization' as defined by ISDEAA, and constitutes an existing inter-tribal entity that must be recognized by Defendants.

J.      A declaratory judgment that the equipment used by the illegitimate NAT 'Shoshone and Arapaho Tribal Court', which was formerly purchased with ISDEAA funding pursuant to the ISDEAA contracts, cannot be converted by NAT for NAT to run the its illegitimate 'Shoshone and Arapaho Tribal Court'.

K.      A declaratory judgment that federal funding for ISDEAA contracts and tribal control of services related to those funds does not depend solely on relative Tribal member populations.

L.      A declaratory judgment that NAT is not entitled to more votes on matters related to Reservation governance or shared programs involving federal funds.

M.     A declaratory judgment that NAT is not entitled to allocations of federal funding under ISDEAA based solely on relative tribal member populations.

N.     A declaratory judgment that EST and NAT must develop an inter-tribal governance entity, using either JBC or a new entity the two tribes develop, in which both tribes participate on equal footing with equal votes, for matters related to shared programs, ISDEAA contracts, and matters involving undivided joint interests.

O.     An award of legal fees and costs, and pre-award costs;

P.     Such other and further relief as this Court deems just and equitable.

Dated this 3rd day of July, 2017.

ELK RIVER LAW OFFICE, PLLP


/s/ Majel M. Russell

ECHO HAWK & OLSEN, PLLC


/s/ Mark A. Echo Hawk

Mark A. Echo Hawk

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of July, 2017, I caused to be served a true and correct

Copy of the foregoing by the method indicated below, and addressed to the following:

Andrew W. Baldwin, Berthenia S. Crocker          ☒     US Mail
Kelly A. Rudd, Mandi A. Vuinovich
BALDWIN, CROCKER, & RUDD, P.C.                    ☐     Hand Delivered
P.O. Box 1229
Lander, WY 82520-1229                             ☐     E-mail
andy@bcrattorneys.com
berthenia@bcrattorneys.com
rudd@bcrattorneys.com
mj@bcrattorneys.com
*Attorneys for Northern Arapaho Tribe*


James D. Todd, Jr.                                ☒     US MAIL
Joseph E. Borson
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch           ☐     Hand Delivered
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530                            ☐     E-mail
james.todd@usdoj.gov
joseph.borson@usdoj.gov
*Attorneys for Federal Defendants*

DATED this 3rd day of July, 2017.


ELK RIVER LAW OFFICE